J-S10010-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAHNEE J. SMITH | : | |
| | : | |
| Appellant | : | No. 408 WDA 2023 |

Appeal from the Judgment of Sentence Entered February 21, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0003724-2022

BEFORE:  OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY OLSON, J.:                **FILED: April 26, 2024**

Appellant, Jahnee J. Smith, appeals from the judgment of sentence entered on February 21, 2023, as made final by the denial of Appellant's post-sentence motion on March 7, 2023.  We affirm.

The Commonwealth charged Appellant with numerous crimes, including two counts of aggravated assault and one count each of persons not to possess firearms, simple assault, recklessly endangering another person ("REAP"), and possession of drug paraphernalia.[1]  Appellant proceeded to a non-jury trial, where the following evidence was presented.

---

[1] 18 Pa.C.S.A. §§ 2702(a)(1) and (4) and 6105(a)(1), 2701(a)(1), and 2705 and 35 P.S. § 780-113(a)(32), respectively.

City of Pittsburgh Police Officer Adam Pernelli testified that, at 4:52 p.m. on February 27, 2022, the police received a ShotSpotter[2] report of a gunshot fired at 2509 Park Hill Drive, in the East Hills neighborhood of Pittsburgh. **See** N.T. Trial, 11/10/22, at 13 and 22; N.T. Trial, 11/14/22, at 12. As Officer Pernelli was responding to the ShotSpotter report, M.P. ("the Victim") called 911 to report an incident between her and Appellant. N.T. Trial, 11/10/22, at 14. Officer Pernelli located the Victim in "the 2340 lot" of Park Hill Drive and noticed that she had "a few cuts and bruises about her face and body" and that she was "very upset" and "crying hysterically." **Id.** at 14-15.

Further, during trial, Officer Pernelli's body-cam footage was admitted into evidence and played to the factfinder. **See id.** at 15. The footage showed

_____

[2] In **Commonwealth v. Weeden**, 304 A.3d 333 (Pa. 2023), the Pennsylvania Supreme Court described ShotSpotter in the following manner:

> ShotSpotter is a [gunfire] detection program that is contracted through an outside party, by the [City of Pittsburgh], through a company, ShotSpotter. . . . [The] ShotSpotter program covers certain areas within the City's limits with the aim of detecting, triangulating, and pinpointing the location of any loud bang, boom, or pop noises via scientific algorithms. . . . [When] ShotSpotter detects such a sound, the program automatically documents the data and sends it, within seconds, to a human operator in California, who then reviews the noise to discern whether it was a gunshot. . . . [I]f a human operator believes that a sound captured by the ShotSpotter program was a gunshot, the operator will send the information back to the [police], which then dispatches officers to the vicinity of the shots fired.

**Commonwealth v. Weeden**, 304 A.3d 333, 336 (Pa. 2023) (quotation marks, citations, and brackets omitted).

Officer Pernelli's interaction with the Victim, with the Victim telling Officer Pernelli: "my boyfriend . . . put his hands on me . . . he had a gun." The Victim also responded in the affirmative when another officer asked her "were you the one that was shot at?" *See id.* at 28.

After Officer Pernelli took the Victim's report, the officer "went up to the original ShotSpotter location to look for any evidence of the shooting, specifically shell casings." *Id.* at 17. He testified that the ShotSpotter location was "up the street, not even [] 100 feet away" and that, at this location, he found a "recently fired . . . FN 5.7 [cartridge] casing."[3] *Id.* As Officer Pernelli testified, the cartridge casing "still had the gun residue on it and it was in good condition. There was no debris beside it. It was on top of the leaves that were there." *Id.* at 17-18.

Officer Pernelli testified that, after he recovered the casing, he and other officers began to search the area for Appellant. He testified:

> We heard a few gunshots. We searched the area. We didn't
> find anything. It happened again a few minutes later. Again,
> we searched the area and didn't find anything. We again
> tried to look for [Appellant] in the area. We did not find him.

*Id.* at 18-19.

---

[3] Officer Pernelli testified that ShotSpotter pinpoints a specific address, but "allow[s] for a radius as to where the bullet or casing specifically would be. I can't recall exactly. I believe it's somewhere in the area of 25 to 50 meters." N.T. Trial, 11/10/23, at 27-28. Officer Pernelli testified that he found the fired cartridge casing "within [the] circle" identified by ShotSpotter. *Id.* at 28.

Officer Pernelli testified that, as they were about to leave the area, he received a communication from Officer Brendan Orris, who was chasing Appellant on foot. Officer Pernelli testified that he located Appellant on "the field between East Hills Drive and Park Hill Drive" and joined the chase. As Officer Pernelli testified: "as we were chasing [Appellant] down the hill toward the field, other officers came from the other side and we were able to [apprehend] him in the middle of the field." *Id.* at 20.

The Commonwealth next called the Victim to testify. The Victim testified that Appellant is her boyfriend and her child's father. *Id.* at 30. At trial, she initially testified that she did not remember: whether an incident occurred between her and Appellant on February 27, 2022 or whether she had any interactions with the police on February 27, 2022. *Id.* at 30-31.

The Commonwealth then introduced the Victim's testimony during Appellant's May 5, 2022 preliminary hearing, where the Victim testified that, on the day in question, "[Appellant and I] were talking [in Appellant's car] and then he looked at me and hit me in my face." N.T. Preliminary Hearing, 5/5/22, at 7; N.T. Trial, 11/10/22, at 35-37. She further testified at the preliminary hearing:

Q: What happened after that?

[The Victim]: I got out of his car and then ran from him.

Q: Where did he go?

[The Victim]: He eventually was driving on the street.

. . .

Q: Did [Appellant] come back?

[The Victim]: Maybe, yes.

Q: Did you say something to him?

[The Victim]: Yes.

Q: What did you say?

[The Victim]: I said "really?".

Q: And what was that about?

[The Victim]: With my injuries.

Q: What did he do then?

[The Victim]: He pulled out a gun and shot towards me.

Q: Did you have to do anything to avoid being shot?

[The Victim]: Yes.

Q: What did you do?

[The Victim]: Moved out of the way.

. . .

Q: Do you know how many times he fired the gun?

[The Victim]: Once.

. . .

Q: And what did you do after he fired the gun?

[The Victim]: I ran away from him.

N.T. Preliminary Hearing, 5/5/22, at 7-9.

- 5 -

The trial court admitted the Victim's preliminary hearing testimony "in its entirety." N.T. Trial, 11/10/22, at 43.

During Appellant's trial, the Victim declared that she could not remember her prior testimony at the preliminary hearing, where she told the trial court that Appellant "pulled out a gun and shot towards me." N.T. Trial, 11/10/22, at 39-41. She also testified during cross-examination at Appellant's trial that: "at no point was a gun ever pointed at" her; "[a]t no point did [she] ever see a gun;" she "lied" to the police when she told them that Appellant shot at her; and, alternatively, Appellant fired a BB gun at her. *Id.* at 48-52.

The Commonwealth next presented the testimony of assistant district attorney ("ADA") Nichole Onda. ADA Onda testified that she communicated with the Victim in preparation for Appellant's trial and that the Victim "was extremely reluctant through every conversation that I had with her. She expressed that while [Appellant] did what he did, she still wanted him to come home." *Id.* at 59. As an example, ADA Onda read an October 21, 2022 email that the Victim sent, where the Victim declared:

> Hi, Ms. Onda, so as you know, I do want and need my child's father/partner out, and I do understand it's not up to me, it's up to the judge. But anyway, I'm going to deny everything and state how I feel and plead the Fifth. I don't want to make it worse for him by me coming because I want to help him, not put him deeper in the dumps. He's already been serving his time. So I know if he knows he will be getting out in six months that would make him feel better, please. I just want this to be over with and let him free in a few months so we can take care of our family and he will continue to get help even while he's out. Thanks. I'm so sorry and this is my last email.

*Id.* at 61-62.

City of Pittsburgh Police Officer Brendan Orris also testified at Appellant's trial. Officer Orris testified that, after he arrived on scene, he began looking for Appellant. He testified:

> I was driving on Park Hill Drive in front of [Appellant's] residence, I can't immediately recall what those digits are, 2524 [Park Hill Drive] maybe, and across the street I saw a male that fit the description of [Appellant] so I yelled out my window and I said, hey [Appellant].
>
> . . .
>
> He looked at me and then immediately looked away which I thought was kind of odd so I stopped my patrol car and I got out. I approached [Appellant] and asked him for some ID. He said that he had to get it out of his vehicle. He started walking around a beige SUV. I began to follow him and whenever he saw I was following, he began to take off running across Park Hill Drive and then behind the row houses that [are] on the park side of Park Hill Drive.
>
> . . .
>
> I followed him through the backyards of the houses on the park side of Park Hill Drive. Him and I both fell a few times. He was able to gain some distance on me until we got into the park where he was cut off by other [police] officers who had him at gunpoint and were able to take him into custody.

N.T. Trial, 11/17/22, at 8-9.

During cross-examination, Officer Orris testified that he did not "do any gunshot residue testing on [Appellant's] person" and he did not test the fired cartridge casing for fingerprints. *Id.* at 14-15.

At the conclusion of trial, the trial court found Appellant guilty of aggravated assault, persons not to possess firearms, simple assault, and

REAP.[4]  On February 21, 2023, the trial court sentenced Appellant to serve an aggregate term of four to eight years in prison for his convictions.  N.T. Sentencing, 2/21/23, at 26.  The trial court denied Appellant's post-sentence motion on March 7, 2023 and Appellant filed a timely notice of appeal.  He numbers three claims on appeal:

> 1. Whether the evidence was insufficient to convict [Appellant] of persons not to possess firearms where the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] ever possessed a firearm?
>
> 2. Whether the evidence was insufficient to convict [Appellant] of aggravated assault with a deadly weapon where the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] possessed a firearm with the intent to cause bodily injury to [the Victim]?
>
> 3. Whether the evidence was insufficient to convict [Appellant] of recklessly endangering another person where the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] recklessly engaged in conduct that placed [the Victim] in danger of death or serious bodily injury?

Appellant's Brief at 5.

Appellant's contends that the evidence was insufficient to support his convictions.  We review Appellant's sufficiency of the evidence challenges under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is

---

[4]  18  Pa.C.S.A.  §§ 2702(a)(4),  6105(a)(1),  2701(a)(1),  and  2705, respectively.

sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Callen*, 198 A.3d 1149, 1167 (Pa. Super. 2018) (citations and quotation marks omitted).

On appeal, Appellant contends that the evidence was insufficient to support his convictions for persons not to possess firearms, aggravated assault with a deadly weapon, and REAP, because there was no credible evidence that Appellant ever possessed a firearm. *See* Appellant's Brief at 12. Appellant's claim fails.

As the Pennsylvania Supreme Court has held:

criminal convictions which rest only on prior inconsistent statements of witnesses who testify at trial do not constitute a deprivation of a defendant's right to due process of law, as long as the prior inconsistent statements, taken as a whole, establish every element of the offense charged beyond a reasonable doubt, and the finder-of-fact could reasonably have relied upon them in arriving at its decision. Prior inconsistent statements, which meet the requirements for admissibility under Pennsylvania law, must, therefore, be considered by a reviewing court in the same manner as any

other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction.

***Commonwealth v. Brown***, 52 A.3d 1139, 1171 (Pa. 2012) (footnote omitted).

In the case at bar, the Victim testified at trial that: "at no point was a gun ever pointed at" her; "[a]t no point did [she] ever see a gun;" she "lied" to the police when she told them that Appellant shot at her; and, alternatively, Appellant fired a BB gun at her. N.T. Trial, 11/10/22, at 48-52. This testimony, however, was inconsistent with the Victim's own prior testimony at Appellant's preliminary hearing, where she testified that Appellant "pulled out a gun and shot towards me." ***See*** N.T. Preliminary Hearing, 5/5/22, at 7-9. Therefore, the Commonwealth introduced the Victim's preliminary hearing testimony as substantive evidence at Appellant's trial. The trial court then admitted the Victim's preliminary hearing testimony, in accordance with Pennsylvania Rule of Evidence 803.1(1). ***See*** N.T. Trial, 11/10/22, at 43. This Rule declares:

> The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:
>
> (1) Prior Inconsistent Statement of Declarant-Witness. A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and:
>
> > (A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;
> >
> > (B) is a writing signed and adopted by the declarant; or

(C) is a verbatim contemporaneous electronic recording of an oral statement.

Pa.R.E. 803.1(1).

Appellant does not claim that the trial court erred when it admitted the Victim's preliminary hearing testimony as substantive evidence at trial. *See* Appellant's Brief at 1-19. In any event, we note that the admission of this evidence was proper, since: the Victim's preliminary hearing testimony was inconsistent with her testimony at trial; the Victim testified at trial and was "subject to cross-examination about the prior statement;" and, the Victim's preliminary hearing testimony "was given under oath subject to the penalty of perjury." *See* Pa.R.E. 803.1(1).

The Victim's preliminary hearing testimony, when combined with the other evidence introduced at trial, is clearly sufficient to support the fact-finder's conclusion that Appellant shot a firearm at the Victim on the day in question. This evidence includes: at 4:52 p.m. on February 27, 2022, ShotSpotter reported a gunshot fired at 2509 Park Hill Drive, in the East Hills neighborhood of Pittsburgh; as the police were responding to the scene, the Victim called 911 to report an incident between her and Appellant; the police found the Victim in "the 2340 lot" of Park Hill Drive and noticed that she had "cuts and bruises about her face and body," was "very upset," and "crying hysterically;" during her interaction with the police, the Victim told them that Appellant "put his hands on me" and that he "had a gun" and the Victim further acknowledged that she was "the one that was shot at;" during Appellant's

preliminary hearing, the Victim testified that Appellant "pulled out a gun and shot towards me" and that he fired the gun "once"; the police found a "recently fired . . . FN 5.7 [cartridge] casing" 100 feet away from the Victim's location, and "within [the] circle" identified by ShotSpotter; Appellant fled when the police found him; and, prior to trial, the Victim told an assistant district attorney that she "need[s Appellant] out" and that, at trial, she was "going to deny everything" and "plead the Fifth."

When viewed in the light most favorable to the Commonwealth, the evidence is sufficient to support the fact-finder's conclusion that Appellant shot a firearm at the Victim on the day in question. Therefore, Appellant's claims on appeal fail.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

4/26/2024